**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| MR Access Inc.,<br><br>Plaintiff,<br><br>v.<br><br>GE HealthCare Technologies, Inc. and GE Medical Systems, LLC,<br><br>Defendants. | Civil Action No. __________<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff MR Access Inc. ("MR Access"), for its Complaint against Defendants GE HealthCare Technologies, Inc. ("GE Techs.") and GE Medical Systems, LLC ("GE Medical") (collectively, "Defendants" or "GE HealthCare"), alleges as follows:

## NATURE OF THE ACTION

1. This is a civil action for infringement of United States Patent Nos. 6,969,992 (the "'992 Patent"), RE47,026 (the "'026 Patent") and 9,847,471 (the "'471 Patent") (collectively the "Patents-in-Suit"), arising under the Patent Laws of the United States, 35 U.S.C. §§ 271 et seq.

## THE PARTIES

2. Plaintiff MR Access is a corporation organized and existing under the laws of the State of Delaware.

3. MR Access was founded by magnetic resonance ("MR") scientists, engineers, and radiologists with the goal of expanding access to magnetic resonance imaging ("MRI") technology. Despite its clinical importance, access to MRI remains severely limited worldwide.

Approximately 70% of the global population lacks access to MRI due to the high costs of equipment, installation, and maintenance, as well as the need for specialized facilities and trained radiologists. These limitations result in delayed diagnoses, preventable morbidity and mortality, and reduced quality of life for millions of patients. By leveraging the technological advancements disclosed in the Patents-in-Suit, MR Access aims to deliver MRI scans at a fraction of current costs, significantly expanding access to this critical diagnostic modality.

4. Defendant GE Techs. is a corporation organized and existing under the laws of the State of Delaware, with corporate headquarters at 500 W. Monroe Street, Chicago, Illinois 60661.

5. Defendant GE Medical is a limited liability company organized and existing under the laws of the State of Delaware, with headquarters at 3200 N. Grandview Blvd, Waukesha, WI 53188.

6. Defendant GE Techs. owns 100% of its subsidiary Defendant GE Medical. *See* Ex. 6 at 7. On information and belief, Defendant GE Techs. directs and controls Defendant GE Medical.

7. Defendants have appointed The Corporation Trust Company at Corporation Trust Center, 1209 Orange St., Wilmington, DE 19801 as their agent for service of process. *See* Ex. 4 at 1.

8. GE Techs., itself and/or through its subsidiaries and affiliates, including GE Medical, makes, uses, and commercializes infringing MRI systems marketed under the tradename "SIGNA™" and infringing coils for SIGNA™ systems that themselves infringe the Patents-in-Suit and which use infringing methods and processes for conducting magnetic resonance examinations.

9. GE HealthCare markets, offers for sale, sells, imports, and supports the accused MRI systems and related software and hardware throughout the United States, including in Delaware. *See, e.g.*, Ex. 5 at 1.

10. On information and belief, GE Techs. acts directly and/or through subsidiaries, affiliates, and agents—including GE Medical—to design, manufacture, market, offer for sale, sell, import, and support the accused MRI systems and functionality in the United States. *See, e.g.*, Ex. 6 at 2, 3, 5, 7, 9.

11. On information and belief, GE Medical manufactures, imports, uses, offers to sell, and/or sells infringing products and services throughout the United States, including in this District, knowing that they would be sold in this District and elsewhere in the United States. For example, GE Medical is listed as the "distributor" of accused MRI systems in 510(k) applications to offer those systems for sale in the United States. *See, e.g.*, Ex. 7 at 1.

## JURISDICTION AND VENUE

12. MR Access incorporates by reference paragraphs 1–11.

13. This action arises under the patent laws of the United States, including 35 U.S.C. §§ 271 et seq. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1338(a).

14. This Court has personal jurisdiction over each Defendant because they each have a continuous, systematic, and substantial presence within this judicial district and have purposely availed themselves of the rights and benefits of this forum such that it should reasonably anticipate suit in this District.

15. This Court also has personal jurisdiction over GE Techs. because it is incorporated in Delaware, has committed acts of infringement in Delaware, and has transacted business in Delaware.

16. This Court further has personal jurisdiction over GE Techs. because, on information and belief, GE Techs. itself or through its subsidiaries—including GE Medical—purposefully

markets, sells, imports, and supports the accused MRI systems in the United States and this District, including through related entities and partner sellers.

17. This Court also has personal jurisdiction over GE Medical because it is incorporated in Delaware, has committed acts of infringement in Delaware, and has transacted business in Delaware.

18. This Court further has personal jurisdiction over GE Medical because, on information and belief, it purposefully markets, sells, imports, and supports the accused MRI systems in the United States and this District. For example, as previously stated, GE Medical is listed as the "distributor" of accused MRI systems in 510(k) applications to offer those systems for sale in the United States. *See, e.g.*, Ex. 7 at 1.

19. Venue is proper in this District under 28 U.S.C. § 1400(b) as to GE Techs. because GE Techs. is organized under the laws of Delaware and resides in Delaware. GE Techs. conducts business in Delaware, at least by offering for sale and selling products and services, including the accused infringing products and services, through its websites, which are accessible in Delaware. GE Techs. has committed and continues to commit acts of infringement in this District.

20. Venue is proper in this District under 28 U.S.C. § 1400(b) as to GE Medical because GE Medical is organized under the laws of Delaware and resides in Delaware. GE Medical conducts business in Delaware, at least by offering for sale and selling products and services, including the accused infringing products and services, through its websites, which are accessible in Delaware. GE Medical has also committed and continues to commit acts of infringement in this District.

21. GE HealthCare has committed and continues to commit acts of infringement in this District, including by offering for sale and selling accused MRI systems in this District such that

those systems infringe as sold and/or infringe via their customary use as directed by the Defendants.

## BACKGROUND OF THE INVENTIONS

22. MRI is a critical diagnostic technology used to detect and monitor a wide range of medical conditions, including cancer, stroke, neurological disorders, and spinal injuries, with high accuracy and without exposing patients to ionizing radiation.

23. MRI systems operate by generating a strong static magnetic field and applying radio-frequency ("RF") pulses to excite hydrogen protons within the body. These RF pulses create a secondary magnetic field, commonly referred to as the B1 field, which perturbs the alignment of the protons. As the protons return to equilibrium, they emit signals that are detected by RF receive coils and reconstructed into medical images.

24. Conventional MRI systems historically relied on single-channel or static RF coil architectures, which function adequately at lower magnetic field strengths but become more electrically lossy and less uniform in transmit and receive at higher field strengths.

25. At higher magnetic field strengths, short wavelength RF fields interfere to produce interference patterns, leading to non-uniform excitation fields and degraded image quality. These technical challenges long prevented the widespread adoption of high-field and ultra-high-field MRI systems for clinical use.

26. Dr. J. Thomas Vaughan, a leading researcher in biomedical engineering and radiology, and his collaborators recognized these limitations and developed solutions that fundamentally advanced MRI technology.

27. In a breakthrough in Ultra High Field ("UHF") MRI, Dr. Vaughan introduced the use of transverse electromagnetic ("TEM") RF coil designs, which replaced traditional lumped-element

coils with distributed transmission-line structures. Unlike conventional coils, TEM-based systems allow individual coil elements to be independently controlled, enabling precise adjustment of RF field characteristics.

28. Building on this innovation, Dr. Vaughan and his collaborators developed multi-channel RF transmission and reception systems in which multiple independently controlled channels are used to shape and optimize the RF excitation and/or reception field.

29. This approach, commonly referred to as parallel transmission, allows MRI systems to compensate for RF field inhomogeneity by adjusting the phase, amplitude, frequency, and/or timing of signals applied to individual coil elements to give optimal RF control over spatial selection.

30. These advancements enabled the development of high-field and UHF MRI systems, which provide improved signal-to-noise ratio, safe and enhanced imaging capabilities. Parallel transmission and RF field shimming have since become standard features in modern MRI systems.

31. The inventions claimed in the Patents-in-Suit solved fundamental technical problems that had previously limited MRI technology, enabling high-field and UHF MRI systems, parallel transmission, reception, and RF field optimization, real-time tuning and adaptive control of RF systems, and improved image quality and diagnostic accuracy.

32. The ’992, ’026, and ’471 Patents disclose, for example, novel adaptive RF control systems and methods, including based on feedback and based on the use of algorithms to determine phase, magnitude, frequency, space or time settings for each coil element. The systems and methods disclosed in the Patents-in-Suit enable parallel transmission and other foundational MR technology.

33. These technologies are now widely implemented in modern MRI systems, including those developed and sold by Defendants.

## THE PATENTS-IN-SUIT

34. MR Access incorporates by reference paragraphs 1–33.

35. MR Access is the exclusive licensee of all substantial rights and interest in the Patents-in-Suit, including the right to bring this suit for injunctive relief and to recover damages for any current or past infringement of the Patents-in-Suit and the right to exclusively control this lawsuit.

36. MR Access has complied with the requirements of 35 U.S.C. § 287 for each of the Patents-in-Suit.

### A. The ’992 Patent

37. The ’992 Patent, entitled “Parallel Transceiver for Nuclear Magnetic Resonance System,” was duly and legally issued by the United States Patent and Trademark Office on November 29, 2005. A true and correct copy of the ’992 Patent is attached as Exhibit 1.

38. The inventors listed on the face of the ’992 Patent are J. Thomas Vaughan, Gregor Adriany, Kamil Ugurbil, John Strupp, and Peter Andersen.

39. The ’992 Patent is directed to, among other things, novel systems and methods for parallel RF transmission and reception, in which multiple channels independently control RF signals. The abstract of the ’992 Patent explains that the invention concerns “[a]n excitation and detection circuit having individually controllable elements for use with a multi-element radio frequency coil,” in which characteristics of the driving signal—including phase, amplitude, frequency, and/or timing—are separately controllable and in which feedback for the driving signal associated with each coil element is provided.

40. For example, Claim 16 of the ’992 Patent recites a method including selecting an imaging criterion, configuring a multi-channel transceiver for excitation based on that criterion, delivering excitation to the coil, detecting a plurality of received signals as a function of the excitation, evaluating the received signals as a function of the imaging criterion, and adjusting a selected parameter of at least one independently controllable channel of the transceiver.

41. The ’992 Patent is directed to unconventional, non-routine systems and techniques for performing multi-channel imaging. The ’992 Patent explains that, inter alia, the inventions claimed therein overcame problems in the field. For example, the specification of the ’992 Patent explains that the traditional approach was inadequate for exciting and detecting signals, especially at high field strengths where inhomogeneity effects cause image quality to deteriorate. The patent provides the solution to that problem by providing multi-channel coil systems that adjust the RF field in multi-element body coils per independent element with feedback-driven adjustment.

42. The ’992 Patent enabled the first practical implementations of multi-channel transceivers capable of both transmitting and receiving through independently controlled coil elements, solving long-standing limitations in high-field MRI. The inventive systems that were unconventional at the time of the invention have now become commonplace in the industry and standard in Defendants’ MRI systems.

**B. The ’026 Patent**

43. The ’026 Patent, entitled “High Field Magnetic Resonance,” was duly and legally issued by the United States Patent and Trademark Office on September 4, 2018, as a reissue patent. A true and correct copy of the ’026 Patent is attached as Exhibit 2.

44. The inventors listed on the face of the ’026 Patent are J. Thomas Vaughan, Pierre-François Van de Moortele, Lance DelaBarre, Chris E. Olson, Heather Orser, Anand Gopinath, Kamil Ugurbil, Carl Snyder, Gregor Adriany, Can Akgun, Jinfeng Tian, John Strupp, and Peter M. Andersen.

45. The abstract of the ’026 Patent explains that the invention concerns a magnetic resonance system including multiple channels in which each channel is independently configurable with respect to frequency, phase, time, space, and magnitude, and further includes a processor configured to control current in each coil element and perform RF optimization, including shimming.

46. Claims of the ’026 Patent recite methods for configuring and optimizing RF transmission and reception, including selecting optimization criteria, adjusting transmit and receive parameters across multiple channels, and performing iterative or non-linear algorithms to achieve desired RF field characteristics, such as homogeneity or localization.

47. The ’026 Patent is directed to unconventional, non-routine systems and techniques for performing multi-channel imaging. The ’026 Patent explains that, inter alia, the inventions claimed therein overcame problems in the field. For example, the specification of the ’026 Patent explains that conventional MRI systems are limited at high magnetic field strengths due to RF inhomogeneity and interference patterns, and that the invention addresses these problems by enabling independent, multi-channel control of RF excitation and reception, including dynamic RF field shaping and optimization across multiple coil elements.

48. The ’026 Patent allows for optimization of independent channel pulses such that the industry has been able to achieve more uniform B1 fields, including in UHF MRIs. The

inventive systems that were unconventional at the time of the invention have now become commonplace in the industry and standard in Defendants' MRI systems.

**C. The '471 Patent**

49. The '471 Patent, entitled "Method and Remotely Adjustable Reactive and Resistive Electrical Elements," was duly and legally issued by the United States Patent and Trademark Office on December 19, 2017. A true and correct copy of the '471 Patent is attached as Exhibit 3.

50. The inventors listed on the face of the '471 Patent are Carl J. Snyder, J. Thomas Vaughan, Jr., and Charles A. Lemaire.

51. The abstract of the '471 Patent explains that the invention concerns apparatus and methods for automatically varying electrical parameters of circuit elements, including inductance, capacitance, and resistance, by moving a portion of the electrical component relative to another portion based on an electrical signal, including with feedback control to adjust and maintain desired circuit characteristics.

52. Claims of the '471 Patent recite systems including electrical components configured to adjust electrical parameters of circuit components and methods of adjusting those parameters, including through feedback control systems that monitor and maintain desired operating characteristics.

53. The '471 Patent is directed to unconventional, non-routine products and methods for automatic adjustment of electrical MRI components. The specification of the '471 Patent explains that conventional electrically tunable components are often inadequate or incompatible with high-field environments, such as MRI systems, and that the invention addresses these

limitations by providing remotely adjustable electrical elements that can be dynamically controlled and stabilized using feedback in such environments.

54. The ’471 Patent allows for remotely adjustable coils for MRI and methods for MRI imaging with remotely adjustable coils, transforming the MRI experience. The inventive systems and methods that were unconventional at the time of the invention have now become commonplace in the industry and standard in Defendants’ MRI systems and associated coils.

## DEFENDANTS’ INFRINGING ACTIVITIES

### A. The Accused Products

55. MR Access incorporates by reference paragraphs 1–54.

56. GE HealthCare’s accused products include, without limitation, SIGNA™ Systems, such as SIGNA™ 3T MRI scanners (for example, SIGNA Bolt, SIGNA Hero, SIGNA Premier, SIGNA Architect, SIGNA Pioneer, and SIGNA MAGNUS) and further including associated and compatible RF coils, SIGNA™ 7.0T MRI scanners, and SIGNA™ 1.5T Scanners, for example, SIGNA Sprint, SIGNA Champion, SIGNA Artist, SIGNA Voyager, SIGNA Victor, and SIGNA Prime (collectively, the “Accused MRI Systems”). *See* Exs. 8–13. On information and belief, each Accused MRI System includes infringing functionalities, such as MultiDrive RF Transmit and AIR™ Technology Suite. *See, e.g.*, Ex. 14 at 7; Ex. 15 at 4–5; Ex. 16 at 3.

57. In or around 2011, GE HealthCare “unveil[ed] … MultiDrive RF Transmit,” which was explained as an “innovation[] [to] improve signal uniformity across the FOV regardless of patient size.” Ex. 17 at 67. GE HealthCare explained that the result of MultiDrive RF Transmit was “a productive yet flexible approach to accommodating any patient size, shape, and type, to improve RF uniformity without sacrificing image quality or patient safety.” *Id.* GE HealthCare

further stated that the MultiDrive RF Transmit "unleash[ed] the power of 3.0T on the Discovery* MR750w." *Id.*

58. GE HealthCare states that MultiDrive RF Transmit "optimiz[es] the phase and amplitude of each RF amplifier output channel that is applied to GE's 70 cm whole-body RF transmit coil" so that "the RF uniformity and signal homogeneity improves regardless of the patient's shape, size, and/or body habitus." Ex. 14 at 7. GE HealthCare further explains that MultiDrive RF Transmit offers "Digital RF pulse control" with "2 amplitude modulators" and "2 frequency/phase modulators," enabling independent control of RF transmission parameters across channels. *Id.* "MultiDrive automatically compensates and virtually eliminates B1-induced signal shading across different body shapes and sizes. The result is consistently clear and uniform images." Ex. 18 at 1.

59. GE HealthCare's materials for MultiDrive RF Transmit further explain that MultiDrive RF Transmit "has two modes of operation. The Preset mode utilizes predetermined RF amplitude and phase settings to generate the best possible image quality over a broad range of patients." Ex. 18 at 2. The Preset mode is "[o]ptimized for the general population." *Id.* These materials instruct using MultiDrive RF Transmit to enable optimized and adaptive RF transmission to improve B1 homogeneity across the imaging volume. *Id.* The "Per-Patient Optimization mode can be selected to customize the RF system for each individual patient. It executes a rapid calibration scan to create an RF map over the region of interest." *Id.* "At the end of the scan, the system automatically calculates the optimal RF amplitude and phase values based on the RF map data." *Id.*

60. On information and belief, GE HealthCare optimizes phase and amplitude through a non-linear algorithm that uses the non-linear relationship between flip angle and signal intensity to

shim the coil and includes a penalty function that constrains, for example, SAR limits. *See, e.g.*, Ex. 19. For example, on information and belief, the Accused MRI Systems equipped with MultiDrive RF Transmit create a B1 map using a non-linear algorithm according to the Bloch-Siegert equation. *See, e.g.*, Ex. 19 (GE scientists describing their use of a non-linear algorithm to create B1 maps). On information and belief, the Accused MRI systems then use those maps to optimize phase and magnitude while penalizing SAR in order to "minimize any local, concentrated heating in tissues." *See, e.g.*, Ex. 20 at 2. GE HealthCare confirms that it verifies safety criteria for local SAR "by using local SAR human modeling simulations for RF multi drive transmit." Ex. 21 at 17. Thus, SAR verification is a constraint involved in GE HealthCare's MultiDrive algorithm.

61. GE HealthCare has manufactured, marketed and sold infringing systems including MultiDrive RF Transmit in the United States. For example, GE HealthCare's materials for SIGNA™ Premier describe SIGNA™ Premier as using MultiDrive RF Transmit. *See, e.g.*, Ex. 14 at 7. As another example, the 510(k) summary for SIGNA Pioneer states "the SIGNA Pioneer uses multi-drive RF transmit for imaging of the head and body regions." Ex. 21 at 16–17. On information and belief, all 3.0T Accused MRI Systems since 2011 employ and have employed MultiDrive RF Transmit.

62. On or about 2017, GE HealthCare announced U.S. 510(k) clearance of its new Air Technology. *See* Ex. 22.

63. GE HealthCare has marketed and sold SIGNA™ systems, such as SIGNA 1.5 T and SIGNA 3.0T MRI systems, in the United States. GE HealthCare's SIGNA™ materials describe the system as using AIR Technology™ and AIR™ Coils. *See, e.g.*, Ex. 5 at 1, 2; Ex. 22; Ex. 23 at 6, 10, 11; Ex. 24 at 8–9, 12, 14, 16. GE HealthCare's AIR Technology™ and AIR™ Coils are

used as part of SIGNA™ systems, including SIGNA Sprint with Freelium, SIGNA Sprint, SIGNA Champion, SIGNA Artist, SIGNA Voyager, SIGNA Victor, SIGNA Prime, SIGNA Bolt, SIGNA Hero, SIGNA Premier, SIGNA Architect, SIGNA Pioneer, and SIGNA MAGNUS. *See* Ex. 5 at 1, 2; Ex. 22; Ex. 23 at 6, 10, 11; Ex. 24 at 8–9, 12, 14, 16.

64. GE HealthCare states that "[w]ith AIR Touch™, you simply use IntelliTouch™, GE's 1-touch landmarking tool, to activate an optimized set of coils that is selected based on the patient's anatomy." Ex. 25 at 2. GE HealthCare further explains that "AIR Touch™ optimizes for the anatomy and the protocol parameters with a single touch, delivering a 59%** productivity gain from plan to scan. AIR Touch™ automatically integrates all calibration scans, providing uninterrupted workflow for the technologist." *Id.*

65. GE HealthCare further states that "with APx," or "Auto Protocol Optimization," "[i]ntelligent design automatically adapts protocols to varying patient profiles." Ex. 26 at 2. GE HealthCare further explains that "[t]echnologists are liberated from [troublesome] parameter adjustments to optimize scan time and image quality by selecting among protocol parameters automatically calculated by the MR system." Ex. 27 at 11.

66. In or around 2020, GE HealthCare launched SIGNA™ 7.0T, with "precision RF transmitter architecture." Ex. 28 at 2. "In clinical mode, the system transmits on two channels giving the facility flexibility in optimizing the system for uniformity and pushing the system to get the most of its 7.0T capabilities. The SIGNA™ 7.0T RF transmit architecture includes two 7.5kW RF power amplifiers, with capabilities to optimize phase and amplitude for improved uniformity, regardless of patient shape, size, and/or body habitus." *Id.* On information and belief, GE HealthCare optimizes phase and amplitude through a non-linear algorithm that uses the non-linear relationship between flip angle and signal intensity to shim the coil and includes a penalty

function that constrains, for example SAR limits. *See, e.g.*, *id.* GE describes Precision RF transmit as "enabl[ing] development in parallel transmit, improved image quality, and flexibility in research." Ex. 29 at 3.

67. On information and belief, the multi-channel transmit and receive circuitry, processor-driven control, switching / selection functionality, and feedback-based adjustment described in GE HealthCare's own materials are embodied in the Accused MRI Systems.

68. GE HealthCare's own materials, including marketing materials and manuals, thus show that GE HealthCare made, used, marketed, offered for sale, sold, imported, and supported systems in the United States that include independently controllable transmit channels, multi-element RF coils, separate receive channels, processor-driven control lines, B1-shimming adjustments, and other functionalities corresponding to the claims of the Patents-in-Suit. GE HealthCare's materials further instruct that those features are part of the ordinary and customary use of the Accused MRI Systems.

**B. Defendants' Knowledge Of The Patents-In-Suit And Their Infringement**

69. On information and belief, Defendants have been aware of the Patents-in-Suit and the fact that the Accused MRI Systems and associated coils and features, including use of MultiDrive RF Transmit and Air Technology™, practice the claimed inventions of those patents since the issuance of the Patents-in-Suit and/or the launch of the Accused MRI Systems.

70. Defendants have been and are assignees of a number of patents and patent applications that are related to subject matter similar to the Patents-in-Suit and that were filed after the Patents-in-Suit were published. On information and belief, in researching the patentability of their own patents, Defendants did, or at a minimum should have, become aware of the Patents-in-Suit.

71. Further, the Patents-in-Suit and their corresponding patent application publications were cited, either by Defendants or by an examiner, during prosecution of Defendants' own patent applications at the United States Patent and Trademark Office. On information and belief, as persons skilled in the art, Defendants, upon learning of, reviewing, and/or citing the Patents-in-Suit in the numerous instances set forth below, knew or were willfully blind to the fact that their infringing products practiced the Patents-in-Suit.

72. For example, the Information Disclosure Statement submitted on October 30, 2009 for US Patent Application Publication No. 2010/0253462, filed October 30, 2009 by General Electric Co. and titled "Short hybrid microstrip magnetic resonance coils," cites the '992 Patent. Ex. 30 at 1.

73. As another example, the asserted '026 Patent, and U.S. Patent No. 7,800,368, from which the '026 Patent reissued, were both cited by the Examiner in prosecution of US Patent Application Publication No. 2018/0275227, filed March 19, 2018 by General Electric Co., and issued as U.S. Patent 10,942,232 to GE Precision Healthcare LLC (a subsidiary of GE Techs.). Ex. 31 at 1. Furthermore, the Examiner rejected the claims of US Patent Application Publication No. 2018/0275227 in view of U.S. Patent No. 8,604,791 (the "'791 Patent"), which names Dr. Vaughan as an inventor, in a Final Rejection on January 15, 2020. Ex. 32 at 10–11. General Electric Co. then referenced the '791 Patent on March 13, 2020 in traversing the Examiner's final rejection. Ex. 33 at 9. On information and belief, in prosecuting US Patent Application Publication No. 2018/0275227, Defendants would have investigated the Patents-in-Suit and Defendants did, or at a minimum should have, become aware of the Patents-in-Suit.

74. As another example, the ’026 Patent was cited by the examiner during GE Precision Healthcare LLC’s (a subsidiary of GE Techs.) prosecution of the application that became US Patent No. 10,281,538. Ex. 34 at 1.

75. Further, on information and belief, Defendants, including employees and developers, have been at meetings and talks during which the inventors of the Patents-in-Suit discussed aspects of their patented inventions disclosed and claimed in the Patents-in-Suit.

76. Defendants also regularly cite the work of Dr. Vaughan and his co-inventors for subject matter related to the Patents-in-Suit and/or the work leading up to the Patents-in-Suit. *See, e.g.*, Xu *et al.*, Designing Multichannel, Multidimensional, Arbitrary Flip Angle RF Pulses Using an Optimal Control Approach, MAGN. RESON. MED. 59(3):547–60 (2008) (https://pmc.ncbi.nlm.nih.gov/articles/PMC2650716/#R19) (GE researchers citing inventors Vaughan JT, Adriany G, Andersen P, Ugurbil K. “7T vs. 4T: RF power, homogeneity, and signal-to-noise comparison in head images.” MAGN RESON MED., 46:24 –30 (2001)).

77. Further, on December 13, 2024, MR Access sent GE HealthCare a letter providing notice of the Patents-in-Suit and GE HealthCare’s infringement of those patents. Ex. 35 at 1–2. The letter identified the Patents-in-Suit and GE HealthCare’s MRI Products believed to infringe the Patents-in-Suit as well as others of MR Access’s patent portfolio. *Id.* at 1–2, 4–7.

78. As persons skilled in the art, Defendants, upon learning of, reviewing, and/or citing the Patents-in-Suit in the numerous instances set forth above, knew or were willfully blind to the fact that their infringing products practiced the Patents-in-Suit.

79. Despite its knowledge of the Patents-in-Suit and of its infringement of the patents, GE HealthCare has continued to willfully infringe the Patents-in-Suit so as to obtain significant benefits of MR Access’s intellectual property without paying compensation to MR Access. For

example, GE HealthCare has continued to manufacture and sell the Accused MRI Systems and use the claimed methods without a license, and, on information and belief, has generated billions of dollars in revenue from its infringement. Additionally, on information and belief, after becoming aware of the Patents-in-Suit, GE HealthCare proceeded to commercialize new MRI systems and features built on and including the claimed inventions of the Patents-in-Suit. GE HealthCare did so without entering into a license to the Patents-in-Suit.

**COUNT I**

**(Infringement of the ’992 Patent)**

80. MR Access incorporates by reference paragraphs 1–79.

81. The ’992 Patent was valid and enforceable during the period relevant to this action.

82. Defendants infringed one or more claims of the ’992 Patent, literally and/or under the doctrine of equivalents, by making, using, offering for sale, selling, and/or importing into the United States products and methods encompassed by those claims during the term of the ’992 Patent, including the Accused MRI Systems and functionality described above.

83. As one example, the Accused MRI Systems practiced, and Defendants induced and encouraged others to practice, at least claim 16 of the ’992 Patent. For example, on information and belief, use of the Accused MRI systems requires a method that uses parallel transmission in which signals and parameters are adapted as a function of imaging criteria. As described in Defendants’ technical materials, MultiDrive RF Technology is “an automated parallel RF transmit for optimizing B1 at 3.0T.” Ex. 17 at 66. “MultiDrive ensures the phase and amplitude of each RF pulse are adapted for the anatomy of interest.” *Id.* “MultiDrive’s RF modification produces uniform MR signal during reception.” *Id.* “MultiDrive automatically compensates and virtually eliminates B1-induced signal shading across different body shapes and sizes.” *Id.*

84. For example, use of MultiDrive RF Technology on the Accused MRI Systems includes a method comprising:

a. selecting an imaging criteria (*see, e.g.*, Ex. 17 at 62 (explaining that the workflow of the Accused MRI systems contains "features that flexibly adapt to the needs of both the patient and the MR operator" and that it can adapt to user-selected imaging criteria, such as "protocol selection, field-of-view (FOV), and coil element selection with AutoCoil, slice alignment with ReadyBrain, and overall protocol management. With the Linking feature, the entire protocol can be modified with single adjustments to slice alignment and other preferences, rather than requiring the user to manage each series individually"), 67 (allowing user to select "per-patient optimization" mode);

b. configuring a multi-channel transceiver for excitation based on the imaging criteria, wherein each channel of the transceiver is coupled to a respective one of a plurality of current elements of a multi-element radio frequency magnetic resonance coil (*see, e.g.*, Ex. 14 at 7 (showing that systems with MultiDrive independently configure channels of a multi-channel transceiver for excitation, with each channel coupled to a respective coil current element by, for example, stating that MultiDrive RF Technology is a RF transmit architecture with a Transmit/Receive Body coil that is "fully integrated," consisting of "two liquid-cooled 15 kW solid-state RF power amplifiers" and that the architecture improves RF uniformity and signal homogeneity "[b]y optimizing the phase and amplitude of ***each amplifier output channel*** that is applied to GE's 70 cm whole-body RF transmit coil"); Ex. 18 at 1 (explaining that "independent

exciters are used" and that MultiDrive uses a "four-port drive, whole-body RF transmit coil design."); Ex. 17 at 67 ("Each RF pulse is sent to independent RF amplifiers before being applied to each of the four drive ports of the RF transmit coil.");

c. delivering excitation to the coil (*see, e.g.*, Ex. 18 at 1 (explaining that "independent exciters are used to generate the RF pulse waveform shape, amplitude, and phase"); Ex. 14 at 7 (providing an "RF exciter frequency range" of 127.72 +/- 0.625 MHz); *see* Ex. 17 at 67 (explaining that for per-patient optimization, the system "executes a rapid, 10 to 15 second calibration scan to create an RF flip angle (B1) map over the region of interest");

d. detecting a plurality of received signals as a function of the excitation (*see, e.g.*, Ex. 14 at 7 (explaining that the Accused MRI Systems receive signals with a receiver resolution < 0.6Hz/step as a function of that excitation via the "Transmit/Receive Body Coil."); Ex. 17 at 66 ("MultiDrive's RF modification produces uniform MR signal ***during reception***"); *see also, e.g.*, Ex. 18 at 1 (same));

e. evaluating the received signals as a function of the imaging criteria (*see, e.g.*, Ex. 17 at 66 (explaining that "MultiDrive: An Automated Parallel RF Transmit for Optimizing B1 at 3.0T" and that "MultiDrive automatically compensates and virtually eliminates B1-induced signal shading"), 67 (explaining that the system uses a "calibration scan to create an RF flip angle (B1) map over the region of interest"); Ex. 18 at 1–2 (explaining that Per-Patient Optimization Mode includes automatic compensation of B1-induced signal shading and

"virtual[] eliminat[ion] of RF-induced signal shading," and other feedback-based processes used to improve transmit field homogeneity and image quality); and

f. adjusting a selected parameter of at least one channel of the transceiver, each channel controllable independent of any other channel of the transceiver (*see, e.g.*, Ex. 18 at 1 (explaining that based on that evaluation, including the evaluation of the B1 map, the accused systems adjust one or more parameters because "[t]he phase and amplitude of each RF pulse is modified before being applied to the RF coil"); Ex. 36 at 1 ("RF pulse amplitude and phase control" is "fully automated and independent"); Ex. 37 at 1 (MultiDrive coils "enable users to change phase and amplitude independently"); Ex. 38 at 9 ("The SIGNA Pioneer system with GE's MultiDrive RF transmit technology as a standard system feature. This system features a high efficiency 4-port drive RF body coil and independent RF amplitude and phase control to Improve RF signal homogeneity across the field of view. The system features a fully automated optimization to adjust the RF settings for each patient to deliver optimal image quality regardless of patient size or shape.")).

85. Defendants' Accused MRI Systems therefore implement multichannel transmit in which received signals are evaluated based on testing criteria and channel elements are adjusted independently from one another, as claimed in at least claim 16 of the '992 Patent.

86. Defendants' technical documentation, user manuals, training materials, and marketing materials, including those cited above, instruct and encourage customers to use B1 shimming, anatomy-specific optimization, patient-specific transmit adjustment, volume-selective excitation,

zoomed imaging, and other parallel transmit workflows that perform the foregoing method. For example, Defendants instruct users to select a mode of operation, enable per-patient optimization features, acquire RF measurements via a rapid calibration scan, evaluate the resulting RF signals to create a RF flip angle (B1) map over the region of interest, and apply optimized channel-specific transmit settings (the optimal RF amplitude and phase values) based on the B1 map data, thereby encouraging users to perform each step of claim 16.

87. GE HealthCare has infringed one or more claims of the ’992 Patent under 35 U.S.C. § 271(a) and (f), either literally and/or under the doctrine of equivalents, by making, using, selling, and/or offering for sale, and/or importing, the Accused MRI Systems either themselves and/or by directing and/or controlling the performance of the claimed steps by third parties (such as MRI technicians, hospitals, research universities, laboratories, healthcare providers, and third-party sellers and servicers) selling and/or performing the Accused MRI Systems.

88. In addition, or in the alternative, Defendants have induced infringement, and continue to induce infringement, of one or more of the claims of the ’992 Patent under 35 U.S.C. § 271(b). GE HealthCare actively, knowingly, and intentionally induced infringement of the ’992 Patent by selling or otherwise supplying the Accused MRI Systems to third parties (such as MRI technicians, hospitals, research universities, laboratories, healthcare providers, and third-party sellers and servicers) with the knowledge and intent that those third parties will use the Accused MRI Systems supplied by Defendants to infringe the ’992 Patent. Defendants have acted with the knowledge and intent to encourage and facilitate third-party infringement through the dissemination of the Accused MRI Systems and/or the creation and dissemination of supporting materials, instructions, manuals, guides, and/or technical information related to the Accused MRI Systems, including those cited above. Defendants further provide training programs in this

country for new system operators and "advise[] that anyone who operates the system should attend this session after reading the Operator Manual and related training materials." Ex. 40 at 143. On information and belief, at those training sessions, GE HealthCare encourages and facilitates its partner laboratories, clinical sites, and doctor offices to infringe the '992 Patent. *See, e.g.*, Ex. 40 at 34 (emphasizing the importance of Multi Drive RF).

89. GE HealthCare specifically intends and is aware that the ordinary and customary use of the Accused MRI Systems by their customers and partners would infringe the '992 Patent. For example, GE HealthCare sells and provides the Accused MRI Systems and compatible coils, which when used in their ordinary and customary manner intended and instructed by Defendants, infringe one or more claims of the '992 Patent, including at least claim 16. On information and belief, GE HealthCare's customers and partners include, among others, MRI technicians, hospitals, research universities, laboratories, healthcare providers, and third-party sellers and servicers. On information and belief, GE HealthCare further provides product manuals and other instruction materials, including those cited above, that cause their customers and partners to operate the Accused MRI Systems according to their ordinary and customary use. GE HealthCare accordingly induces third parties to use the Accused MRI Systems in their ordinary and customary way to infringe, knowing, or at least being willfully blind to the fact, that such use constitutes infringement of the '992 Patent.

90. In addition or in the alternative, Defendants have contributed to the infringement by third parties, such as health care providers or laboratories, of one or more of the claims of the '992 Patent under 35 U.S.C. § 271(c), by making, selling and/or offering for sale in the United States, and/or importing into the United States, the Accused MRI Systems and/or compatible coils knowing that those products constitute a material part of the inventions of the '992 Patent,

knowing that those products are especially made or adapted to infringe the ’992 Patent and knowing that those products are not staple articles of commerce suitable for substantial non-infringing use.

91. Defendants have knowledge of and notice of the ’992 Patent and their infringement since at least the launch date of each of the infringing products.

92. Defendants’ infringement of the ’992 Patent has been willful and deliberate.

93. MR Access has been damaged by Defendants’ infringement of the ’992 Patent.

94. Defendants’ conduct in infringing the ’992 Patent renders this case exceptional within the meaning of 35 U.S.C. § 285.

**COUNT II**

**(Infringement of the ’026 Patent)**

95. MR Access incorporates by reference paragraphs 1–94.

96. The ’026 Patent is valid and enforceable.

97. Defendants have infringed, and continue to infringe, one or more claims of the ’026 Patent by making, using, offering for sale, selling, and/or importing products and/or methods, including at least the Accused MRI Systems, encompassed by those claims.

98. As one example, GE HealthCare infringes at least claim 11 of the ’026 Patent. For example, on information and belief, the Accused MRI Systems include non-linear algorithmic optimization to determine phase and magnitude settings for individual coil elements while penalizing parameters such as high SAR levels in order to achieve desired RF field characteristics, including uniformity and spatial localization. For example, the Accused MRI Systems are systems comprising:

a. a radio frequency (RF) transmit coil having a plurality of current elements (*see, e.g.*, Ex. 18 at 1 (explaining GE HealthCare has “developed MultiDrive RF transmit to

tighten RF control and virtually eliminate 3.0T image shading in a wide bore system. MultiDrive uses the four-port drive, whole-body RF transmit coil design introduced with the Discovery* MR750w to help keep the RF uniform across the FOV"); Ex. 17 at 67 ("Each RF pulse is sent to independent RF amplifiers before being applied to each of the four drive ports of the RF transmit coil."));

b. a multichannel transmitter having a plurality of transmit channels, each of the plurality of transmit channels coupling to at least one of the plurality of current elements in the RF transmit coil and being configured for independent selection of at least one of frequency, phase, magnitude, and time (*see, e.g.*, Ex. 18 at 1 (explaining that "independent exciters are used to generate the RF pulse waveform shape, amplitude and phase. These RF pulses are sent to independent RF amplifiers before being applied to the four ports of the RF body coil. However, MultiDrive goes one step further. The phase and amplitude of each RF pulse is modified before being applied to the RF coil.") (image reproduced below); Ex. 36 at 1 ("RF pulse amplitude and phase control" is "fully automated and independent"); Ex. 37 at 1 (MultiDrive coils "enable users to change phase and amplitude independently"); Ex. 14 at 7 (stating that the "phase and amplitude of each RF amplifier output channel that is applied to GE's 70 cm whole-body RF transmit coil" is optimized));



c. a processor coupled to the multichannel transmitter, wherein the processor is configured to execute instructions to control a current in each element and to perform a non-linear algorithm that implements a non-linear relationship between flip angle and magnetic resonance signal intensity to shim the RF transmit coil (*see e.g.*, Ex. 17 at 67 (explaining that "a rapid, 10 to 15 second calibration scan [] create[s] an RF flip angle (B1) map over the region of interest") (explaining that in "per-patient optimization" mode, "the system ***automatically calculates*** the optimal RF amplitude and phase values based on the B1 map data"); Ex. 19 (GE scientists describing their use of a non-linear algorithm and the non-linear relationship between flip angle and magnetic intensity to generate B1 maps and then using those maps as "an input to an optimization algorithm to find the best amplitude and phase of channel 2 versus channel 1 to obtain the best transmitted B1+ uniformity"));

d. and wherein the non-linear algorithm uses a penalty function that returns a value describing a phase and a magnitude for each current element in the RF transmit coil (*see e.g.*, Ex. 17 at 67 (explaining that "'per-patient optimization' mode can be selected by the user to optimize the RF system for each individual patient, if desired"

and that "the system automatically calculates the ***optimal RF amplitude and phase values*** based on the B1 map data"); Ex. 39 at 1 ("This technology, called Multi-drive, optimizes RF transmit by adjusting the amplitude and phase of the RF output depending on the anatomy being scanned."); Ex. 19 (GE scientists describing their use of a non-linear algorithm includes a penalty function, explaining that to maximize SNR, a non-linear equation "shows that we should minimize $\Delta\omega_{BS}$ subject to minimal direct saturation of the water peak, while maximizing B1, peak, subject to SAR constraints," and using said function to generate the amplitude and phase "at the same time"); Ex. 40 at 34 (explaining that GE manages SAR by "implementing a special Body Coil Design called Multi Drive RF, and utilizing general and specific SAR models")).

99. On information and belief, Defendants' Accused MRI Systems therefore implement multichannel transmit in which phase and magnitude are independently adjusted based on the systems' non-linear algorithm that uses the non-linear relationship between flip angle and signal intensity to form a B1 map and penalizes parameters such as SAR in determining magnitude and phase, as claimed in at least claim 11 of the '026 Patent.

100. Defendants have infringed, and continue to infringe, one or more claims of the '026 Patent under 35 U.S.C. § 271(a) and (f), either literally and/or under the doctrine of equivalents, by making, importing, selling, and/or offering for sale the Accused MRI Systems either themselves and/or by directing and/or controlling the performance of the claimed steps by third parties (such as MRI technicians, hospitals, research universities, laboratories, healthcare providers, and third-party sellers and servicers) selling and/or performing the Accused MRI Systems.

101. In addition, or in the alternative, Defendants have induced infringement, and continue to induce infringement, of one or more of the claims of the ’026 Patent under 35 U.S.C. § 271(b). Defendants actively, knowingly, and intentionally induce infringement of the ’026 Patent by selling or otherwise supplying the Accused MRI Systems to third parties (such as MRI technicians, hospitals, research universities, laboratories, healthcare providers, and third-party sellers and servicers) with the knowledge and intent that those third parties will use the Accused MRI Systems supplied by Defendants to infringe the ’026 Patent. Defendants act with the knowledge and intent to encourage and facilitate third-party infringement through the dissemination of the Accused MRI Systems and/or the creation and dissemination of supporting materials, instructions, manuals, guides, and/or technical information related to the Accused MRI Systems, including those cited above. Defendants further provide training programs in this country for new system operators and “advise[] that anyone who operates the system should attend this session after reading the Operator Manual and related training materials.” Ex. 40 at 143. On information and belief, at those training sessions, GE HealthCare encourages and facilitates its partner laboratories, clinical sites, and doctor offices to infringe the ’026 Patent. *See, e.g.*, Ex. 40 at 34 (emphasizing the importance of Multi Drive RF in managing SAR).

102. Defendants’ technical documentation, user manuals, training materials, and marketing materials, including those cited above, instruct and encourage customers and users to select a mode of operation, enable per-patient optimization features, acquire RF measurements via a rapid calibration scan using a non-linear algorithm to create a RF flip angle (B1) map over the region of interest, and apply optimized channel-specific transmit settings (the optimal RF amplitude and phase values) based on the B1 map data and with a penalty to limit certain test

attributes, such as SAR, thereby using the claimed system in claim 11 and/or performing each step of one or more claims of the ’026 Patent.

103. Defendants specifically intend and are aware that the ordinary and customary use of the Accused MRI Systems by their customers and partners would infringe the ’026 Patent. For example, Defendants sell and provide the Accused MRI Systems and compatible coils, which when used in their ordinary and customary manner intended and instructed by Defendants, infringe one or more claims of the ’026 Patent, including at least claim 11. On information and belief, GE HealthCare’s customers and partners include, among others, MRI technicians, hospitals, research universities, laboratories, healthcare providers, and third-party sellers and servicers. On information and belief, Defendants further provide product manuals and other instruction materials, including those cited above, that cause their customers and partners to operate the Accused MRI Systems for their ordinary and customary use. Defendants accordingly induce third parties to use the Accused MRI Systems in their ordinary and customary way to infringe, knowing, or at least being willfully blind to the fact, that such use constitutes infringement of the ’026 Patent.

104. In addition or in the alternative, Defendants contribute to the infringement by third parties, such as health care providers or laboratories of one or more of the claims of the ’026 Patent under 35 U.S.C. § 271(c), by making, selling, and/or offering for sale in the United States, and/or importing into the United States, the Accused MRI Systems and/or compatible coils knowing that those products constitute a material part of the inventions of the ’026 Patent, knowing that those products are especially made or adapted to infringe the ’026 Patent and knowing that those products are not staple articles of commerce suitable for substantial non-infringing use.

105. Defendants have had knowledge of and notice of the ’026 Patent and their infringement since at least the launch date of each of the infringing products and/or the issuance of the ’026 Patent if after product launch.

106. Defendants’ infringement of the ’026 Patent has been, and continues to be, willful and deliberate since at least the launch dates of the Accused MRI Systems.

107. MR Access has been and continues to be damaged by Defendants’ infringement of the ’026 Patent and will suffer irreparable injury unless the infringement is enjoined by this Court.

108. Defendants’ conduct in infringing the ’026 Patent renders this case exceptional within the meaning of 35 U.S.C. § 285.

## COUNT III

### (Infringement of the ’471 Patent)

109. MR Access incorporates by reference paragraphs 1–108.

110. The ’471 Patent is valid and enforceable.

111. Defendants have infringed, and continue to infringe, one or more claims of the ’471 Patent by making, using, offering for sale, selling, and/or importing products and/or methods, including at least the Accused MRI Systems, encompassed by those claims.

112. As one example, Defendants infringe at least Claim 1 of the ’471 Patent by making, using, offering for sale, selling, and/or importing the Accused MRI Systems with AIR Technology. On information and belief, the Accused MRI Systems with AIR coils have miniaturized tuning and matching circuitry in each of the coils, through which the systems sense changes in the parameters of the RF circuit and adapt based on that sensed feedback. For example, use of the Accused MRI Systems with AIR Technology requires a method comprising the steps of:

a. providing an RF circuit in a remote environment, wherein the RF circuit includes an electrical component having a characteristic impedance at a resonance frequency of the RF circuit in the remote environment (*see, e.g.*, Ex. 41 at 1 ("[A] new flexible and highly decoupled RF coil for use in MR imaging of RT patients"); Ex. 42 at 6 ("GE's Direct Digital Interface (DDI) employs an independent analog-to-digital converter to digitize inputs from each RF channel."); Ex. 38 at 13 ("Remote display panel provides the ability to monitor the system's operation from the control room"));

b. changing a characteristic of the remote environment that affects the characteristic impedance and the resonance frequency of the RF circuit (*e.g.*, a patient entering the scanner);

c. sensing a parameter of the RF circuit and generating an electrical feedback signal based on the sensed parameter (*see, e.g.*, Ex. 27 at 11 ("Auto protocol Optimization enables a simple and automated workflow for breath-hold imaging."); Ex. 26 at 2 ("Intelligent design automatically adapts protocols to varying patient profiles"); Ex. 43 at 10 (describing that Auto Protocol Optimization "enabl[es] rapid adjustment of imaging parameters for patient circumstances"));

d. based on the electrical feedback signal, automatically changing the electrical component to adjust both the characteristic impedance and the resonance frequency (*see, e.g.*, Ex. 26 at 2 (describing SIGNA™ technologies as "automatically adapt[ing] protocols to varying patient profiles," such as "slice thickness," "# slices," "frequency," "phase matrix"); Ex. 25 at 2 (explaining that "[w]ith AIR Touch™, you simply use IntelliTouch™, GE's 1-touch landmarking tool, to activate an optimized set of coils that is selected based on the patient's anatomy" and further explaining that

"AIR Touch™ optimizes for the anatomy and the protocol parameters with a single touch, delivering a 59%** productivity gain from plan to scan. AIR Touch™ automatically integrates all calibration scans, providing uninterrupted workflow for the technologist"); Ex. 43 at 10 (describing that Auto Protocol Optimization "enabl[es] rapid adjustment of imaging parameters for patient circumstances"); Ex. 41 at 1–2 ("The circuit is completed by the addition of an impedance-matched resonant circuit that allows tuning of the resonant frequency of the circuit to the Larmor frequency of the MR scanner") (providing a schematic of the matching circuit) (reproduced below)).




113. Defendants' Accused MRI Systems therefore implement feedback-controlled adjustment of electrical parameters in MR RF systems, as claimed in the '471 Patent.

114. Defendants have infringed, and continue to infringe, one or more claims of the '471 Patent under 35 U.S.C. § 271(a) and (f), either literally and/or under the doctrine of equivalents, by making, using, selling, and/or offering for sale, and/or importing, the Accused MRI Systems either themselves and/or by directing and/or controlling the performance of the

claimed steps by third parties (such as MRI technicians, hospitals, research universities, laboratories, healthcare providers, and third-party sellers and servicers) selling and/or performing the Accused MRI Systems.

115. In addition, or in the alternative, Defendants have also induced infringement, and continue to induce infringement, of one or more of the claims of the '471 Patent under 35 U.S.C. § 271(b). Defendants actively, knowingly, and intentionally induce infringement of the '471 Patent by selling or otherwise supplying the Accused MRI Systems to third parties (such as MRI technicians, hospitals, research universities, laboratories, healthcare providers, and third-party sellers and servicers) with the knowledge and intent that those third parties will use the Accused MRI Systems supplied by Defendants to infringe the '471 Patent. Defendants act with the knowledge and intent to encourage and facilitate third-party infringement through the dissemination of the Accused MRI Systems and/or the creation and dissemination of supporting materials, instructions, manuals, guides, and/or technical information related to the Accused MRI Systems, including those cited above.

116. Defendants' technical documentation, user manuals, training materials, and marketing materials, including those cited above, instruct and encourage customers to use B1 shimming, anatomy-specific optimization, patient-specific transmit adjustment, volume-selective excitation, zoomed imaging, and other parallel transmit workflows that perform the foregoing method. For example, Defendants instruct users to utilize miniaturized tuning and matching circuitry in AIR coil systems which sense changes in the parameters of the RF circuit and adapt based on that sensed feedback, thereby encouraging users to perform each step of claim 1.

117. Defendants specifically intend and are aware that the ordinary and customary use of the Accused MRI Systems by their customers and partners would infringe the '471 Patent. For

example, Defendants sell and provide the Accused MRI Systems and compatible coils, which when used in their ordinary and customary manner intended and instructed by Defendants, infringe one or more claims of the ’471 Patent, including at least claim 1. On information and belief, GE HealthCare’s customers and partners include, among others, MRI technicians, hospitals, research universities, laboratories, healthcare providers, and third-party sellers and servicers. On information and belief, Defendants further provide product manuals and other instruction materials, including those cited above, that cause their customers and partners to operate the Accused MRI Systems for their ordinary and customary use. Defendants accordingly induce third parties to use the Accused MRI Systems in their ordinary and customary way to infringe, knowing, or at least being willfully blind to the fact, that such use constitutes infringement of the ’471 Patent.

118. In addition or in the alternative, Defendants contribute to the infringement by third parties, such as health care providers or laboratories of one or more of the claims of the ’471 Patent under 35 U.S.C. § 271(c), by making, selling and/or offering for sale in the United States, and/or importing into the United States, the Accused MRI Systems and/or compatible coils knowing that those products constitute a material part of the inventions of the ’471 Patent, knowing that those products are especially made or adapted to infringe the ’471 Patent, and knowing that those products are not staple articles of commerce suitable for substantial non-infringing use.

119. Defendants have had knowledge of and notice of the ’471 Patent and their infringement since the ’471 Patent issued.

120. Defendants’ infringement of the ’471 Patent has been, and continues to be, willful and deliberate.

121. MR Access has been and continues to be damaged by Defendants' infringement of the '471 Patent and will suffer irreparable injury unless the infringement is enjoined by this Court.

122. Defendants' conduct in infringing the '471 Patent renders this case exceptional within the meaning of 35 U.S.C. § 285.

**PRAYER FOR RELIEF**

WHEREFORE, MR Access respectfully requests judgment in its favor and against Defendants as follows:

A. That Defendants have infringed each of the Patents-in-Suit;

B. That Defendants' infringement of each of the Patents-in-Suit has been willful;

C. That MR Access be awarded damages adequate to compensate it for Defendants' recoverable infringement of the Patents-in-Suit, together with prejudgment and post-judgment interest, costs, and disbursements as justified under 35 U.S.C. § 284;

D. That any award of damages be enhanced under 35 U.S.C. § 284 as a result of Defendants' willful infringement;

E. That this case be declared exceptional within the meaning of 35 U.S.C. § 285 and that MR Access be awarded its attorneys' fees, costs, and expenses incurred in connection with this action;

F. That MR Access be awarded either a permanent injunction, or, at least, a compulsory ongoing royalty with regard to the '026 and '471 Patents; and

G. That MR Access be awarded such other and further relief at law or in equity as this Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff MR Access hereby demands a trial by jury on all issues so triable.

Dated: October 2, 2026

Respectfully submitted,

FARNAN LLP

/s/ Michael J. Farnan
Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 North Market Street, 12th Floor
Wilmington, DE 19801
Telephone: (302) 777-0300
Facsimile: (302) 777-0301
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

*Attorneys for Plaintiff MR Access Inc.*

Of Counsel:

Paul A. Bondor
Deborah J. Mariottini
Pascale S. Boonstra
DESMARAIS LLP
230 Park Avenue
New York, NY 10169
Telephone: 212-351-3400
Facsimile: 212-351-3401
pbondor@desmaraisllp.com
dmariottini@desmaraisllp.com
pboonstra@desmaraisllp.com

Atifah Safi
DESMARAIS LLP
1899 Pennsylvania Ave NW Ste 400
Washington, DC 20006
Telephone: 202-451-4900
Facsimile: 202-451-4901
asafi@desmaraisllp.com